# MERRILL, ET AL. v. ROCKY MOUNTAIN CATTLE CO. ET AL.

(No. 898; Decided June 23rd, 1918; 181 Pac. 964.)

VENDOR AND PURCHASER—SUFFICIENCY OF TITLE—REAL ESTATE—SUBMISSION TO ARBITERS—CORPORATION AGREEMENT WITH STOCKHOLDERS—CONTRACT—TIME THE ESSENCE OF—AGREEMENT TO CONVEY PUBLIC LANDS—ISSUANCE OF PATENT—CONSTRUCTION OF CONTRACT—"MUNIMENTS OF TITLE"—SPECIFIC PERFORMANCE—LAND CONTRACT—MUTUALITY—CHANGE IN VALUE OF PROPERTY.

1. Where vendors agreed to convey all lands to which it secured good title during a two-year period and at the expiration of the period to submit muniments of title to named arbiters for determination as to sufficiency of its title to lands not theretofore conveyed, they were not required, upon expiration of the period, to tender the deed to land for which they had only such muniments of title possessed at date of contract, and were not bound to submit such muniments of title to arbiters; purchasers having been dissatisfied therewith at date of contract.

2. Where a corporation, having arranged to distribute the assets to its stockholders according to their respective interests, agreed to convey to certain stockholders such lands as it could perfect its title to during two-year period, and gave the stockholders possession thereof during such period, time was of the essence of the contract.

3. Vendor being owner of forest lieu scrip in the name of another, giving it the right to select, enter, and patent in the name of such other party, vacant public lands, and having agreed to convey such lands to which it is able to obtain title during a certain period, was not bound to convey land patented during period, where the land was not conveyed to vendor by grantee named in patent within period.

4. Title passes to grantee named in patent to United States vacant public land on date that patent is issued and recorded in proper office at Washington.

5. A contract, requiring vendor to convey lands to which it obtains title during certain period and to submit to arbiters at expiration of period such "muniments of title as it or its agents or trustees then possess or possesses," construed to provide for submission to arbiters of documentary evidence of title in actual possession and control of vendor, as distinguished from constructive possession, at the expiration of period.

6. If a land contract be construed as obligating vendors to sell after a certain date and does not obligate purchasers to accept land after such date, it is lacking in mutuality and will not be specifically enforced.

7. Where purchasers, knowing that vendors had obtained title to land they had agreed to convey upon obtaining title within a certain period, and knowing of prospective increase in value because of discovery of oil wells on other lands, did not sue for specific performance until after tests had been made and the land found to produce oil, they will be estopped from asserting their right to specific performance at such time.

8. Specific performance of a land contract is not decreed as a matter of course, but is granted or withheld according as equity and justice seem to demand in view of all the circumstances of the case.

ERROR to District Court, Hot Springs County, HON. E. C. RAYMOND, Judge.

Action by George Merrill, et al., against the Rocky Mountain Cattle Company, et al., for specific performance of contract for the sale of real estate. Judgment for defendants and plaintiffs bring error. Other material facts are stated in the opinion.

*C. A. Zaring* and *Frank Pierce,* for plaintiff in error

The contention that the execution of a bond by plaintiff in error was a condition precedent to full performance by defendant in error is without merit for the reason that the bond was waived; but this provision was not a condition precedent. (Raley v. Umatilla County, 15 Ore. 172, 3 A. S. R. 142; 2 Devlin on Deeds, Sec. 964 (2 Ed.) ; 2 Washburn on Real Property (5 Ed.), p. 3, sec. 2.) Stipulations are not to be construed as conditions precedent unless made necessary by the terms of the contract. (Deacon v. Blodgett, 111 Cal. 416 (see 70 A. S. R. 832, notes) ; 9 Cyc. 588; Waterman on Specific Performance, sec. 435.) Waiver may be shown by circumstances. (40 Cyc. 267.) Waiver operates as estoppel. (Bigelow on Estoppel (6 Ed.), 717; 10 R. C. L. 694; Wilmore v. Stetler, 137 Ind. 127, 45 A. S. R. 169 and note; 16 Cyc. 791, 792; Louisville Ry. Co. v. Flanagan, 113 Ind. 488, 3 A. S. R. 674, 678.) One cannot

appropriate benefits and disavow burdens arising on con-
tract. (Blackwell v. Kercheval, 27 Idaho 537, 149 Pac.
1060; Miller v. Hare, 43 W. Va. 647, 39 L. R. A. 491;
Lane v. P. I. N. Ry., 8 Idaho 230, 67 Pac. 656.) Equity
will not countenance inconsistent positions; defendants first
relied solely on the time limit. They cannot now change
their base. (Railway Co. v. McCarthy, 96 U. S. 267; Ger-
mania Fire Ins. Co. v. Pitcher, 160 Ind. 392, 64 N. E. 921;
Bigelow on Estoppel (6 Ed.), 744-745; Davis v. Wakelee,
156 U. S. 690; McDonough v. Co., 112 Fed. 636; Stanton
v. Barnes, 72 Kan. 544, 84 Pac. 117.) The case of Frank
v. Stratford-Handcock, 13 Wyo. 37, is unlike the present
case, as will appear from an examination of the pleadings
and facts. The title to Parcel 3 vested in defendants May
7th, 1914, two days before the expiration of the contract,
title passes by the signing of a United States patent.
(United States v. Schurz, 102 U. S. 378.) Title of the
assignee of forest scrip relates back upon the issuance of
the patent to the time of entry. (Frank F. McCain, 34
L. D. 126; Kern Oil Co. v. Clarke, 30 L. D. 550; French
v. Spencer, 21 Howard 228.) The principle is supported
by numerous other authorities. When a contract has been
partly executed by possession taken under it, the court will
enforce performance, if possible. (Fry Spec. Per. 335;
Pomeroy Spec. Per. 96.) No reliance should be placed upon
the discovery of mineral subsequent to the contract. In-
adequacy of price that will defeat specific performance must
exist at the time the contract was made. (Hale v. Wilkin-
son, 21 Gratt. 75.) Increase in value after date of contract
is not ground for refusing specific performance. (Low v.
Treadwell, 12 Me. 441; Cady v. Gale, 5 W. Va. 547; Wil-
lard v. Tayloe, 8 Wall. 557; Meehan v. Nelson, 137 Fed.
731; Am. Ann. Cas. 1912, C. 560.) While the granting
of specific performance is discretionary, it will ordinarily be
granted as a matter of course, where the contract is in writ-
ing, certain in terms based on valuable consideration, fair
and just and capable of being enforced without hardship
to either party. (4 Pom. Eq. 1404.) The court erred in

granting the motion of the Ohio Oil Company for non-suit. It should have been kept in the case pending settlement of the controversy between the other parties. (Frank v. Stratford-Handcock, 13 Wyo. 37.)

*Edward T. Clark, Herbert V. Lacey* and *John W. Lacey,* for defendants in error.

The memorandum opinion of the trial court is not material to this inquiry. (Little v. Co., 100 S. W. 561; Holland v. Ry. Co., 101 N. W. 608; Martin v. Martin, 67 N. E. 1; Morgan v. Co., 107 Pac. 695; Randall v. Co., 43 N. E. 540.) There was a separate contract for each parcel of land and each admitted of separate execution in the matter of a separate agreement. (Perkins v. Hart, 11 Wheaton (24 U. S.), 237, 250; Small v. Co., 20 Fed. 753; Myers v. Croswell, 45 O. S. 543; Wooton v. Walters, 14 S. E. 734; McGrath v. Cannon, 57 N. W. 150.) The contract as to Parcel 3 expired not later than May 13th, 1914, removing any possible right to specific performance. Plaintiffs failed to perform an election to furnish a stipulated bond; under the facts there was no waiver of this requirement. (Rice v. Deposit Co. (8th Cir.), 43 C. C. A. 270.) A waiver in law is the intentional relinquishment of a known right. (Aronson v. Ins. Co., 99 Pac. 537.) There must be acts of relinquishment amounting to an estoppel. (Bank v. Maxwell, 55 Pac. 980; Perin v. Parker, 18 N. E. 747; Holdsworth v. Tucker, 143 Mass. 369; Berman v. Assc., 78 Atl. 462; List v. Chaise, 88 N. E. 120.) No estoppel is pleaded and the point is not available. (Nebraska Co. v. Blust, 60 N. W. 1016; Homberger v. Alexander, 40 Pac. 260; Union Co. v. Bank, 72 Pac. 586.) But no estoppel was proven. (Norton v. Kearney, 10 Wis. 1043.) There was no evidence that plaintiff accepted benefits; there was no possession and no improvements made by plaintiff. The doctrine of relation as to the passing of land titles has no application here. Equity will not aid plaintiffs in error, since it is clear that they are seeking to open a contract which on their agreement had been closed, and this for the purpose of profiting by oil discoveries. (Whitney v. Fox, 166 U. S. 637; Turn-

lick v. Marbury, 91 U. S. 587; Johnson v. Standard Co., 148 U. S. 360; Patterson v. Hewitt, 195 U. S. 309.)  The decree of the court below should be affirmed.

Potter, Justice.

This is an action for specific performance wherein, as the case is presented here, the plaintiffs are seeking a decree requiring execution and delivery to them of a good and sufficient deed conveying a tract of land containing approximately forty acres and described as Lot Two (2) of Section Nineteen (19) in Township Forty-six (46) North of Range Ninety-eight (98), West of the 6th Principal Meridian, in this state.  Upon a trial in the District Court, judgment was rendered upon a general finding in favor of the defendants, and the case is here on error.

As the plaintiffs in error were plaintiffs below and the defendants in error defendants below, they will be referred to respectively as plaintiffs and defendants, when not mentioned by name, but a reference to the defendants collectively will include only the Rocky Mountain Cattle Company and L. G. Phelps, against whom only a decree for specific performance is sought.  The plaintiffs are George Merrill, H. J. Guthrie Nicholson, and George Pennoyer.

The contract upon which the action is based is in writing and set out in full in the amended petition upon which the action was tried, and the material parts thereof are as follows :

"This Agreement Made and entered into. in triplicate this 9th day of May A. D. 1912 by and between Rocky Mountain Cattle Company, a corporation, duly organized and existing under the laws of the State of Wyoming, by L. G. Phelps, its President, duly authorized, party of the first part, and George Merrill, G. J. Guthrie Nicholson and George A. Pennoyer, of Embar, Big Horn County, Wyoming, parties of the second part, and L. G. Phelps, witnesseth :

"That Whereas, Under the terms of a certain contract made and entered into by certain of the stockholders of the

Rocky Mountain Cattle Company on the 13th day of August 1910 wherein it was agreed by the said stockholders that the assets of the Company should be distributed upon terms therein designated, which said contract was duly ratified at a regular meeting of the stockholders of the said Company at the office of the Company on August 13th, 1910, and,

"Whereas, Under the terms of the said contract there was no time limit placed upon the acquisition of titles to certain lands then initiated, which said lands were subsequently conveyed by warranty deed to George Merrill, G. J. Guthrie Nicholson and George A. Pennoyer under the terms of the contract aforesaid, and

"Whereas, The parties hereto have agreed that title to the following lands included in the lands described in the warranty deed aforesaid, viz: (describing several tracts of land, containing a total of 1040 acres, and including the 40 acre tract aforesaid) which were initiated at the date of the contract aforesaid, so entered into, should not have been included in the Warranty Deed aforesaid, title not having inured to the Rocky Mountain Cattle Company.

"Now, Therefore, for and in consideration of the payment of the sum of Twenty Thousand Eight Hundred ($20,-800.00) Dollars to them in hand paid, the receipt whereof is hereby acknowledged, the parties of the second part herein do hereby agree to execute and deliver to the party of the first part herein a quit-claim deed to all of the property hereinbefore enumerated, and the party of the first part herein agrees that it will use all due diligence to obtain title to the lands hereinbefore described within Two (2) years from this date and will convey the same to the parties of the second part herein for the sum of Fourteen ($14.00) per acre, it Being Understood and agreed that the party of the first part herein is not required, under the terms of this contract, to obtain such title whenever it would be required to pay any sum in excess of Fourteen ($14.00) dollars per acre for such land. And the parties of the second part herein agree that they will pay the said sum of Fourteen ($14.00) Dollars per acre upon tender of good and sufficient title, as

the same may be secured from time to time during the period of Two (2) years aforesaid, to any of the lands herein set forth and will execute a good and sufficient bond in favor of the party of the first part herein conditioned that upon tender of good and sufficient deed to any of such lands save and excepting where surface rights only are required by the party of the first part under the terms hereof, then and in that event such surface rights shall be considered a full compliance with the terms hereof and such payment of Fourteen ($14.00) dollars per acre shall be made, it being understood and agreed, however, that such purchase and payment of and for the lands hereinbefore designated is conditioned upon the sale and disposal of all of the stock of the parties of the second part herein in the Rocky Mountain Cattle Company under the terms of this agreement prior to such purchase and payment; should such title be perfected and offered before the sale of the stock of the parties of the second part herein, then the payment shall be made at the rate of Twenty ($20.00) per acre for such land.

"It is understood and agreed by and between the parties hereto that the right of possession of the parties of the second part, without let or hindrance of the party of the first part, to the lands hereinbefore set forth shall continue during the period of Two (2) years herein designated and that the Quit-claim deed shall contain a clause to that effect and the parties of the second part paying the taxes thereon.

"It is understood and agreed by and between the parties hereto that a deed or deeds to the lands hereinbefore designated, as titles shall be acquired from time to time under the terms hereof, shall be tendered to S. C. Parks, of Cody, Wyoming, who shall be authorized by the parties of the second part herein to receive such deed or deeds and make payment therefor within Thirty (30) days of such tender.

"It is further understood and agreed by and between the parties hereto that the party of the first part herein does not guarantee the procurement of title to any of the land hereinbefore designated within the time designated, but agrees to use all reasonable diligence to procure the same under the

terms and conditions of this contract and the parties of the second part agree that they will not molest or hinder the party of the first part in its endeavor to procure such titles.

"It is further understood and agreed by and between the parties hereto that at the expiration of Two (2) years from the date hereof the party of the first part shall submit to E. E. Enterline and E. T. Clark of Sheridan, Wyoming, at Sheridan, Wyoming, such muniments of title as it or its agents or trustees then possesses or possess to lands hereinbefore described but which have not been, in the meantime, conveyed, to the parties of the second part, under the terms of this agreement, and the said E. E. Enterline and E. T. Clark shall thereupon determine what muniments of title are sufficient, in their judgment, to warrant the party of the first part conveying or assigning its right thereto in the lands to which such muniments of title pertain to the said parties of the second part, as well as the parties of the second part receiving the same, and designate the character of instrument or instruments in writing by which the ownership thereto shall pass from the party of the first part to the parties of the second part, the parties of the second part agreeing to pay the sum of Fourteen ($14.00) Dollars per acre for all such lands or muniments of title so conveyed or assigned."

The petition aforesaid, after setting out said contract, describes the lands covered thereby to which said petition relates by classifying them as Parcels 1, 2, 3 and 4, respectively, and designating the land in controversy here as Parcel 3. The allegations as to Parcel 4 were eliminated upon demurrer. The petition alleges and the answer admits that title to the separate tracts described as Parcels 1 and 2 respectively was acquired by the defendant Phelps and conveyed to the plaintiffs within the two year period prescribed by the contract,—title to Parcel 1 having been acquired in May, 1913, and conveyed to plaintiffs in August of that year, and title to Parcel 2 having been acquired in June, 1912, and thereafter conveyed to plaintiffs. The averment as to Parcel 2 does not state the date of its conveyance to the

plaintiffs, but it must have been within said two year period, for, as shown by the evidence, no muniments of title covering that parcel were submitted at the end of that period.

The petition aforesaid alleges certain other facts which are admitted by the answer of said defendants, including the following:

That the defendant Phelps for a long time prior to May 9, 1912, was and ever since has been the president of the Rocky Mountain 'Cattle Company, and executed and delivered said contract as such officer; that he owned a large majority of the stock of said company, and managed its business and dictated its policy; that in his proceedings to secure title to said lands he was acting for the company; that said company was at all times dominated and controlled by him; and that he signed and executed said contract, thereby binding himself to all the covenants and conditions thereof. That during all the times referred to said Company was the owner of 320 acres of "Jed L. Washburn Forest Lieu Scrip", authorized by certain stated Acts of Congress and regulations of the Secretary of the Interior, which gave the owner of such scrip the right to select, enter and receive patent in the name of said Jed L. Washburn, but for the use and benefit of the owner of the scrip, a number of acres of vacant public lands open to settlement equivalent to the amount of scrip so held by the owner. That when said contract was executed most of the lands therein described had been selected by this state under its various land grants, and applications had been made by the defendant Phelps on behalf of said company to purchase the same from the state; that the remainder of said lands had theretofore been entered with said "Forest Lieu Scrip" for or on behalf of the defendants; and that the defendants, at the date of the contract, had already secured substantial rights to each and every parcel of land described therein. That on April 5, 1911, the defendant Phelps, acting for and on behalf of said company, selected and caused to be entered in the United States land office at Lander, Wyoming, in the name of said Jed L. Washburn, the lands described as Parcel 3, using for said

entry a part of said 320 acres of the Jed L. Washburn Forest Lieu Scrip, owned by said company, and that said defendants used great diligence to obtain title to said Parcel 3, and on the 7th day of May, 1914, patent thereto was issued by the United States in the name of said Jed L. Washburn.

It is also alleged as to said Parcel 3, but denied by the answer, that after the issuance of the patent thereto, and on the 13th day of August, 1914, and in violation of the terms of said contract, the defendant Phelps caused said land to be conveyed to himself and that he still holds the legal title thereto. It is assumed in the brief of plaintiffs that it was intended by the denial of said averment to deny only that the conveyance alleged was in violation of the contract, and presumably that is what was intended, for it appears that the land was conveyed to the defendant Phelps on the date alleged, under a power of attorney executed by said Jed L. Washburn to whom the patent was issued.

The petition further alleges that said defendants at the expiration of two years from the date of the contract refused and still refuse to submit any muniments of title to said Enterline and Clark, claiming that plaintiffs have no right to any of said lands. This was also denied by the answer. There are other averments of the petition denied by the answer which need not be recited here but may be referred to in the course of the discussion if found necessary.

The answer alleges as a separate defense that the defendants did not, during the two-year period aforesaid,—two years from May 9, 1912, possess any muniments of title to the lands designated in the contract, save and except to those parcels which were conveyed during that period to the plaintiffs under the terms of the contract, and that the plaintiffs were notified of that fact on May 13, 1914, and that the contract was terminated and closed. That no demand was made upon the defendants for the conveyance of the land designated as Parcel 3 until August 28, 1914, at which time the plaintiffs believed the land to be of great value because of the discovery of valuable mineral thereon, which dis-

covery had been made by said defendants a few weeks prior to that date, and that such demand was made solely because of such valuable discovery of mineral. That on May 9, 1914, said defendants were not in a position to offer the plaintiffs any better title to the said land than they were on May 9, 1912, when the contract was entered into, and could not on May 9, 1914, and for a month subsequent thereto, offer any other muniment of title thereto than they were in possession of at the date of the contract. A reply was filed denying generally said new matter in the answer.

The following facts are shown by the evidence: On May 9, 1912, the date of the contract aforesaid, the plaintiffs executed to the defendant company a quit claim deed conveying the land' described in the contract, which deed was thereafter duly recorded, and it contained, as required by the contract, a provision reserving a right of possession in the plaintiffs "for two years hereafter," that is to say, two years after the date of said deed, or until and including May 9, 1914. That deed, or the copy thereof in the record, also recites as the consideration therefor the payment to the grantors, the plaintiffs herein, of the sum of $20,400.00, by the said grantee, the defendant company; but the contract states such consideration as $20,800.00, and that sum is mentioned in the testimony as the consideration. Mr. Nicholson, one of the plaintiffs, explained the consideration and the reason for the contract provision for the deed, when testifying as a witness, as follows:

"In the original agreement of the dissolution of the Rocky Mountain Cattle Company we arrived at so much land should go to Mr. Merrill and myself and so much should go to himself. On the books of the company there were two charges, $200,000 against L. G. Phelps and $100,000 against Merrill, Pennoyer and myself. For that $100,000 so much land was to be turned over to us by warranty deed. It was made out and when it was gone into and we hunted up the titles there was a certain part of that for which there was no title so that in 1912 we agreed to quit claim back the land

to Phelps and he was to surrender to us that $20,800 for which he had already charged us."

Mr. Phelps testified concerning the matter: "Growing out of a deed in 1911, the sufficiency of which was questioned, at a meeting, or at several meetings, in May, 1912, the present agreement was entered into by which under the contract I bought back or the Rocky Mountain Cattle Company bought back all the lands in which the titles was questioned, and $20,800 was paid in cash for this property and I entered into possession of it, or the Rocky Mountain Cattle Company, whichever you wish to style it, and in order to compromise any question and to settle all matters amicably it was agreed that for two years Merrill, Nicholson and Pennoyer were to occupy the lands and I was to use my best endeavor to secure title to the land." An objection being made to the statement of the witness, "it was agreed", he added: "I have stated the reason, part of my titles were questioned and I bought back the land," paying $20,800 for it.

The defendants had no notice or knowledge of the issuance of the patent to Parcel 3 on May 7, 1914, until the receipt by Mr. Phelps between the 19th and 23rd of May, 1914, of a postal card from the Land Office at Lander, Wyoming, dated May 15, 1914, stating that a patent had been issued to Jed L. Washburn, and that upon surrender of the proper evidence of ownership it would be delivered to the holder of the title; and the patent was obtained by Mr. Phelps on August 13, 1914. On that date also the land was conveyed to him by deed executed in the name of Jed L. Washburn by Ed. T. Clark, his attorney in fact.

By an agreement dated August 12, 1914, but acknowledged on August 13, 1914, Mr. Phelps leased the land to the Ohio Oil Company, a defendant in this case, for the purpose of mining and operating for oil and gas and laying pipe lines, constructing tanks, buildings and other structures thereon to take care of said products. Under that lease a producing oil well was drilled on the land by said oil company in October, 1914. The land is shown to be valuable for

oil purposes, and to be worth "several thousand dollars". And Mr. Phelps testified, and we think the fact is to be inferred also from other testimony, that when the land was leased it appeared to have a large prospective value because of oil discoveries on other lands; but it does not appear whether such discoveries were or were not in the immediate neighborhood of the land in controversy.

The two-year period prescribed by the contract having expired on May 9, 1914, Mr. Phelps, on that date, wrote to the Mr. Clark named in the contract to act with Mr. Enterline in passing upon any muniments of title submitted by defendants at the expiration of said period requesting him to inform Mr. Enterline that he, Mr. Phelps, had no other muniment of title, and, therefore, desired to terminate the contract; and on May 13, Mr. Clark wrote to Mr. Enterline to the effect that he had received a letter 'from Mr. Phelps stating that with the exception of some lands already conveyed and for which he had been paid there was no change in the conditions affecting the remainder of the lands and that "we would be glad to take up this matter with you so that it may be closed." He received no answer to that letter, but on the day it was written he met Mr. Enterline, told him that he had written the letter and explained its contents, whereupon he was asked by Mr. Enterline if there were any different muniments of title, if he had any other muniments of title than they had on May 9, 1912. Mr. Clark replied: "No, we have no other proof of title than we had at that time." And Mr. Enterline then said that he should consider the contract closed and would write his clients (the plaintiffs) to that effect. On August 26, 1914, Mr. Enterline notified Mr. Clark that he wished a consultation about the Nicholson-Phelps contract, and Mr. Clark then informed him that "we considered the contract closed".

As testified by two of the plaintiffs, money was left or deposited by the plaintiffs with Mr. S. C. Parks of Cody, during all the time after the date of the contract, to pay for

such deeds as might be tendered and accepted under the contract.

The exact time when the plaintiffs first learned that a patent to the land had been issued or when demand for a conveyance of the land was made upon Mr. Phelps, is not definitely shown by the record, owing to the absence therefrom of a letter and telegram introduced in evidence, as exhibit, through no fault, however, of the official reporter who certifies that the missing exhibits were, after the trial, handed to one of the attorneys for the plaintiffs at his request and had not been returned, but, as he, the reporter, was informed, they had been mislaid or lost. But the time when the plaintiffs learned about the patent seems to have been after the first of June, 1914; and the demand for a conveyance, which was by telegram from Mr. Enterline,— the missing telegram, was probably in August, at or about the time when Mr. Enterline notified Mr. Clark of his desire for a consultation about the matter, or on August 28, 1914, as alleged in the answer.

The contract aforesaid, in addition to the provisions thereof above quoted, provided for the sale or division among its stockholders of certain other real and personal property of the defendant company, which, as recited in the contract, included all the property of said company, and for the division thereafter of its cash assets, and that after such division of cash assets the parties of the second part named in the contract,—the plaintiffs herein, shall deliver to L. G. Phelps all the capital stock of the company held by them, viz: 1100 shares, at a price of ten cents per share. A time limit was fixed for the sale or division of the property. Thus the sale of a specified ranch by the company to Phelps at a stated price was provided for within 7 days from the date of the contract, with a provision for repayment of part of the price to Phelps by the plaintiffs if the scrip title to a forty acre tract should fail within 2 years from the contract date. The division of certain live stock within 6 days was provided for, and also within the same period the purchase of other live stock of the company by Phelps at a valuation

fixed by the plaintiffs, or upon his failure to purchase them, within said period of 6 days, then for their purchase at such valuation by the plaintiffs. Provision was made for rebranding all such live stock, and for suspending the use of their former brand for one year; and that if Phelps should purchase the cattle as authorized he should have 2 years in which to gather them, at the expiration of which time the brand should become the property of plaintiffs, or if the cattle were purchased by plaintiffs the title to the brand should vest in them at the expiration of one year.

It appears from the evidence that all the shares of stock of the plaintiffs in said company were delivered to Mr. Phelps sometime in August, 1913, thereby eliminating the condition fixing the price to be paid for the land at $20 per acre. The provision of the contract for the payment of that sum instead of $14 per acre is explained in the testimony of the plaintiff Nicholson as follows: "If the land was deeded to us prior to the delivery of the stock to Mr. Phelps, Merrill, Pennoyer and myself would have participated in our $20 paid. After the delivery of the stock, $14 went to Mr. Phelps, and we had no participation in it then."

The question which we think first necessary to be considered is the character and extent of the obligation of the defendants, under the contract, to convey any of the land therein described to the plaintiffs, and in that connection what obligation was imposed upon defendants to tender a deed to the land in controversy, or submit muniments of title thereto. The contract contains two provisions which, while interdependent and to be construed together in the light of the whole contract, are in a sense separate and distinct. The one which we shall refer to as the first because it first appears in the contract requires due diligence on the part of the defendant company to obtain title to the lands described in a preceding paragraph within two years from the date of the contract and the conveyance thereof to the plaintiffs for the sum of $14.00 per acre, and that the plaintiffs shall pay that sum per acre upon tender of good and sufficient title during said period of two years, as the same

may be secured from time to time, during that period. That is to say, we think that provision is to be construed as obligating the plaintiffs to accept and pay for any of the land upon tender of good and sufficient title during said two-year period, so that the plaintiffs would not be bound under that provision, even though title was secured during said two-year period, to accept or pay for any land unless a good and sufficient title was tendered during that period; and a tender of title under that provision is required to be made to S. C. Parks of Cody, who was to be authorized by the plaintiffs to receive such deed or deeds and make payment therefor within 30 days of the tender.

The consideration for the agreement to use diligence in securing title and then to convey was the reciprocal agreement of the plaintiffs contained in the same paragraph to pay the prescribed sum per acre upon tender during the two-year period of good and sufficient title. The consideration for such agreement was not the payment of the sum of $20,800 recited in the beginning of the paragraph, for that was the consideration passing to the plaintiffs for their quit-claim deed. And that sum was actually paid to the plaintiffs for their conveyance back to the company, as representing, according to the evidence, the amount which had been charged against them on the books of the company for the land. We find nothing in the evidence or admitted facts to substantiate the statement in the brief of plaintiffs that the contract was made to relieve the company from its covenant of warranty, and that for such release defendants agreed to acquire title to the 1040 acres and convey same to plaintiffs. On the contrary, we think the reasonable inference from the evidence and the contract itself is that the plaintiffs did not care to rely on the warranty and hold the lands with the imperfect titles, but preferred a return of the money charged against them therefor, and thereafter to take the lands only if and when good title should be acquired and conveyed within the time specified in the contract. And that would not have been an unreasonable preference in any case, in the absence of some intended

special use sufficient to justify the taking of chances of title being perfected; the future prospective value of the land for oil purposes not being then apparent. But since all the property and assets of the company were soon to pass into private hands, leaving no ostensible reason for the continued existence of the company, it seems entirely reasonable for plaintiffs to have preferred a return of the money consideration.

The second provision requires the company, at the expiration of said period of two years, to submit to E. E. Enterline and E. T. Clark at Sheridan, Wyoming, such muniments of title as it or its agents or trustees then "possesses or possess" to lands which had not in the meantime been conveyed to the plaintiffs, who shall determine what muniments of title are sufficient, *in their judgment,* to warrant a conveyance or assignment by the company of its right to the plaintiffs, or their receiving the same, and designate the character of instrument to be executed to pass the ownership in the lands to which such muniments pertain, and that *for all such lands or muniments of title so conveyed or assigned* plaintiffs shall pay said sum of $14 per acre. This provision seems to eliminate the necessity of tender of a deed or deeds to Mr. Parks for any land embraced in or covered by muniments of title submitted thereunder at the expiration of said two-year period. There is a slight indication by the words used in this provision that there may have been in the minds of the parties at the time a thought of a transfer under it of something less than a complete and perfect title; but, if so, it must certainly have comprehended more than was possessed at the date of the contract.

Now this contract is in some important respects unlike the ordinary contract for the sale of land, where there is an unqualified agreement to sell and buy, assuming that the vendor has or will be able to convey a good and sufficient title. The parties to this contract all understood that the vendor did not have a perfect title and might not acquire such a title to any of the lands within the specified time, if

at all; and the plaintiffs knew exactly the kind of right and title then held. And, since the plaintiffs had objected to that title as imperfect or insufficient, and required by the contract as a condition to their accepting and paying for any of the land, first, a tender of good and sufficient title within two years, expressly without a guaranty that such title would be secured within that time, or, second, a submission, at the expiration of said period, of muniments of title to parcels not previously conveyed, then in the possession of defendants, their agents or trustees, for determination by certain named representatives of the parties respectively, as to whether the rights to lands shown thereby shall be conveyed or assigned or accepted, the defendants had the right to assume that if they had no further muniments of title than at the date of the contract they would not be accepted nor a deed conveying the land covered thereby. And they were not required, we think, at or before the expiration of the two-year period, as to lands for which they possessed only such muniments of title as they had at the date of the contract, to either tender a deed thereto or submit such muniments of title. That this was also the understanding of the parties may be inferred from the fact stated in the testimony of Mr. Phelps and undisputed that as to each tender of a deed during the two-year period a very clear showing of good title was required, supplemented, if needed, by the testimony of Mr. Merrill that Mr. Parks did not feel capable of determining whether a tendered deed was good and thought someone should be appointed, and that Mr. Walls (an attorney of Cody) was suggested "to say whether it was a good and sufficient deed." This testimony of Merrill was given when asked on cross-examaniation what his instructions were in reference to muniments of title before the money of plaintiffs in the hands of Mr. Parks should be paid, the witness having testified that Mr. Parks had been instructed to pay over the money if there was a sufficient deed.

This contract was the result of an arrangement between the stockholders of the defendant company to dispose of its

property and assets by distributing the same among such
stockholders according to their respective interests, and
was a part of the process adopted to accomplish that object.
The buying of certain of the property by particular stock-
holders or by one of them seems to have been but a means
to that end.   And this tends to explain the care exercised
by the plaintiffs to have a good title to the lands described
in the contract if they were to take them instead of their
estimated value in money, and the provision of the contract
for the conveyance and acceptance thereof only with good
title and within the limited period aforesaid.   Time was
clearly of the essence of the contract.   Even the right of
possession reserved in the plaintiffs by the contract and quit-
claim deed was limited thereunder to two years, possession,
as shown by the evidence, having been taken under the war-
ranty deed.   The provisions of the contract relating to these
lands are to be construed in the light of the purpose afore-
said clearly revealed by the contract itself.

Although the patent to the parcel now in controversy was
issued at Washington, D. C., on May 7, 1914, two days
before the expiration of the two years, that fact was not
known to either of the parties until at least ten days after
the expiration of said period, when the defendant Phelps
received notice by mail from the Land Office where the
entry had been made.   In the meantime, Mr. Enterline,
representing the plaintiffs, was notified on behalf of defend-
ants that they had no further muniments of title than at the
date of the contract for land not already conveyed, and
upon receiving that information he declared that he should
consider the contract closed and would write his clients, the
plaintiffs, to that effect.   In that notice to Mr. Enterline
there was clearly no intentional misrepresentation of the
fact, nor, as we think, any actual misrepresentation, within
the meaning of the contract.

To complete the title held at the date of the contract not
only a patent from the United States was necessary, but
also a deed from the grantee named in the patent, though
provision for the latter, as we understand, had been made

through a power of attorney, presumably in the possession or under the control of the defendants at the date of the contract, since, as admitted by the pleadings, the land was entered at the land office in April, 1911. But the execution of a deed from such grantee could not properly be required or expected until the issuance and delivery of patent, or at least until the parties knew that the patent had been issued; and if a deed had been executed and tendered or submitted under this contract, without a showing or knowledge that patent had issued, and a deed from the grantee named therein, it is quite improbable that it would have been accepted or regarded as a compliance with the contract requiring payment of the agreed price. And there is nothing in the case even tending to show that the ignorance or want of knowledge of the parties that patent had issued was inexcusable.

Thus the only muniments of title to the parcel in question that could in fact or actually have been tendered or submitted on that date were those which the defendants held at the date of the contract; and there was no apparent reason for submitting those muniments of title on the date of the expiration of the two-year period, unless accompanied by other muniments acquired after the contract was made. But the contention of the plaintiffs as to this particular parcel is that as title was actually obtained by defendants within the two-year period, they became obligated to convey the same to the plaintiffs for the stipulated price. That is not, however, technically or in fact, true. A legal or fee simple title was not then acquired by defendants because no deed to either of them conveying the title of the grantee named in the patent had been executed, and the defendants, through no fault on their part, were without knowledge or information of the fact that might have made the execution of such a deed proper. Title did actually pass to Jed L. Washburn, the grantee named in the patent, on the date that it was issued and recorded in the proper office at Washington, viz: May 7, 1914, assuming that it was recorded on the date that it was issued, for delivery of a land patent by the United States is not essential to the taking effect of the granting

clause in the instrument, and the defendant Phelps or the company had the right to possession of the patent, upon complying with the rules of the land department in that respect. (U. S. v. Schurz, 102 U. S. 397, 26 L. Ed. 167.) On that date, however, as well also on the date of the expiration of the two-year period, the defendants did not have actual possession of the patent, and could not produce it in support of a tender of title by deed or for submission as a muniment of title; and they did not obtain such possession of it until August 13, 1914. According to the notice received by Mr. Phelps from the land office, proper evidence of ownership was required as a condition to the delivery of the patent.

While in a broad sense, taking into consideration the fact of the issuance of the patent not known to either of the parties at the time, the tender of a deed during the last three days of the two-year period properly conveying Washburn's title to the plaintiffs might have been a tender of good and sufficient title, the defendants were not then in a position to make such tender with muniments of title confirming its sufficiency, as contemplated by the contract and as required in the case of tender of title to other parcels, to require acceptance and payment by the plaintiffs. And we think it plain that the defendants were not at fault in failing to make a tender as to the parcel in question. Indeed, this action does not seem to be predicated upon a wrongful failure to tender title under the first provision of the contract for transferring title, but only upon the alleged refusal of the defendants to submit muniments of title at the expiration of the two-year period. For there is no averment in the petition to the effect that the defendants wrongfully failed or refused to tender title within the time prescribed therefor.

We think there can be no doubt that the provision of the contract requiring the defendant company to submit to Mr. Enterline and Mr. Clark, at the expiration of two years from the date of the contract, such muniments of title as it or its agents or trustees "then possesses or possess" has reference to muniments possessed at the expiration of said period,

that is to say, on May 9, 1914, as distinguished from muniments possessed after but not on or before that date; and also, we think, to muniments so possessed as to be capable of being submitted in some proper way at the time specified. The word "possess" or "possesses", as used in that provision of the contract, must be considered and construed in connection with what was required to be done, and in view of the circumstances aforesaid under which the contract was made, and the evident purpose thereof. The word seems to be used in this contract not only in the sense of or as implying ownership, or the right to possession or control, but equally in the sense of custody or actual as distinguished from merely constructive possession. "Muniments of title" is said to be a general expression for all means of evidence, by which title to real property may be defended. (28 Cyc., 1779.) Or as generally defined it refers to title deeds and other documents relating to the title to land. That which is required to be submitted at the expiration of said period is, therefore, documentary evidence of title.

The defendant company did not, however, at the time stated, possess the patent, except perhaps constructively, and of that it had no knowledge, nor was it in the possession of an agent or trustee of the company. Constructive possession merely without knowledge of the fact or facts creating it, due diligence having been used to obtain title, is not, we think, what was intended or contemplated. And it may be doubtful if mere knowledge that it had been issued, communicated to the arbiters, without ability then to submit it, would have required them to consider it, or the plaintiffs to accept and pay for the land.

So that without fraud, collusion or fault on the part of the company or any agent or trustee it could not submit the patent for the consideration and determination provided for, at the time specified. It did all that it was then able to do. Promptly at the expiration of the period aforesaid notice was given to Mr. Clark and by the latter to Mr. Enterline that the defendants had no further muniments of title to land covered by the contract provisions aforesaid not already

conveyed. And upon that, the contract was verbally declared closed. This, we think, amounted to a rejection of muniments held at the date of the contract as insufficient and relieved the defendants from the duty of presenting them.

No provision was made in the contract for any further examination of titles; but the plaintiffs bound themselves as to land for which muniments were to be submitted at the expiration of the period aforesaid only to pay for lands or muniments of title conveyed or assigned under the determination provided for upon muniments so submitted. If the defendants had been negligent or at fault in failing to learn of the patent, or had fraudulently concealed a fact known to them, a different question might, perhaps, be presented. But within the meaning of the contract, as we think it must be construed, they complied with the provisions of the contract as to this land for submitting muniments of title at the expiration of the period of two years. Had they thereafter proposed to submit the patent after learning of its issuance and receiving it, or other muniments acquired or received after the expiration of the two-year period, plaintiffs might or might not have accepted the same, but without obligation to do so. And there would be lacking a determination of the arbiters named in the contract as to the sufficiency of such muniments and the character of instrument for assignment or conveyance, provided for as a condition to the obligation of plaintiffs to pay the specified price. (Church v. Shanklin, 95 Cal. 626, 30 Pac. 789, 17 L. R. A. 207; Farm Land Mort. Co. v. Wilder, 41 Okla. 45, 136 Pac. 1078; Bank v. Clay (Okla.), 177 Pac. 115; Simmons v. Zimmerman, 144 Cal. 264, 79 Pac. 452, 1 Ann. Cas. 850; Goodwine v. Kelley, 33 Ind. App. 57, 70 N. E. 832; Hudson v. Buck, 7 Eng. L. Rep. Chan. Div. 1877-8, 683; Averett v. Lipscomb, 76 Va. 404; Warvelle on Vendors (2nd ed.), secs. 300-302.)

Church v. Shanklin, *supra,* was an action to foreclose a mortgage to secure notes made payable by defendants to plaintiff "whenever he perfects the title to" certain described

lots "to the satisfaction of 'Church & Cory, attorneys." It was conceded that there was a defect in the title when the notes were executed requiring action by the plaintiff to cure; and it was not shown that the disapproval of the title by the attorneys named was through any fraudulent or improper motive. It was held that as the parties had made the attorneys the umpires between them, if the latter exercised their best judgment in good faith, their conclusion was final and binding, and not subject to the revisory power of the courts without doing violence to the plain words of the contract. This upon the principle upheld in many cases and stated in Butler v. Tucker, 24 Wend. 445, 449, as follows: "But when parties' fix on an umpire and agree to abide by his decision, neither of them, without consent of the other, can withdraw the question of performance from the common arbiter for the purpose of referring it to the decision of a jury."

In Bank v. Clay, *supra*, it appeared that a contract for the sale of an oil and gas lease stipulated that the vendor should furnish to the plaintiffs a complete abstract of title to the land to be submitted to a certain named attorney for the vendees, and that the lease should take effect and the mutual obligations of the parties accrue only in case such attorney should approve the title. The abstract was furnished and upon examination by the attorney named he disapproved the title. Suit was thereupon brought by the vendees to recover a sum of money which had been deposited by them as "earnest money" to secure their faithful performance of the contract. The plaintiffs were allowed to recover, and the following rule was stated: "A vendee cannot be compelled to accept a title which is in fact perfect, but which his attorney in good faith refuses to approve where his contract requires the title to be perfected to the satisfaction of such attorney."

In the English case above cited, Hudson v. Buck, the contract provided for approval of title by the solicitor of Buck, the vendee. And it was held that said solicitor having disapproved the title, the vendor could not enforce specific

performance, in the absence of *mala fides* or unreasonableness on the part of the purchaser or his solicitor. Discussing the question, the court said:

"What, then, does the law imply in the sale of a leasehold property? It implies that the vendor shall make a good title to the property. Is that the same thing as a stipulation that the contract shall be subject to the approval of the title by the purchaser's solicitor? It appears to me that it is not. Observe the difference between the results in the two cases. In the one case the approval or disapproval of the person specified is, in my opinion, in the absence of bad faith or unreasonable conduct, conclusive as to the goodness of the title shewn. In the other case the goodness of the title may be a matter for the decision of the court. * * * It appears to me that it is not unreasonable to suppose that the purchaser should desire to preclude the possibility of such a protracted litigation, and that he should intend to stipulate that the opinion of a particular person, his own solicitor, should be conclusive as to the sufficiency of the title deduced, and that, in the absence of compliance with that condition, the contract should not be capable of being enforced."

Thus upon the theory that the contract requires the defendants to convey the land in controversy to the plaintiffs, the requisite mutuality of obligation and remedy to justify a decree for specific performance would be lacking, under either provision of the contract relating thereto. In Frank v. Stratford-Hadncock, 13 Wyo. 37, 77 Pac. 134, 67 L. R. A. 571, 110 Am. St. Rep. 963, after stating that several so-called exceptions to the general rule that as a prerequisite to specific performance there must exist both mutuality of obligation and remedy had become established in modern equity practice, this court said:

"Where a contract is intended to bind both parties, or where it is of such form or nature that it contains mutual executory provisions, that is to say, where both parties have bound themselves or intended to bind themselves by reciprocal obligations, then no doubt the doctrine as to the requirement of mutuality applies; and in such a case, if for any

reason one of the parties is not bound, he cannot compel performance by the other."

And in our opinion that principal would apply to the contract in this case if it is to be construed as obligating the defendants to convey this land upon the facts aforesaid. We do not, however, understand the obligation of defendants to convey land to which title shall be obtained within two years to be as broad as plaintiffs contend. The agreement in that respect does not stand alone but is qualified by the provisions for tendering title within said period and submitting at the expiration thereof muniments of title then possessed, for examination as to whether the title is good and sufficient in case of a tender, or the determination provided for upon the submission of muniments of title as to whether they are sufficient to warrant conveyance or acceptance. So that the defendants would not become obligated to convey any particular parcel of the land described unless title thereto was obtained and they were also in a position, acting diligently and in good faith, to tender good and sufficient title within said two-year period, or, at the expiration of said period could produce and submit muniments of title that might be declared sufficient to warrant conveyance under the provision of the contract for a determination as to that matter.

And without an obligation to convey there would be no ground for specific performance. Certainly the agreement to use all due diligence to obtain title within the period named, standing alone, would not furnish a basis for specific performance. (Parker v. Sargent, 201 Ill. App. 574 ) In the case cited it was held that an agreement of a defendant to use his "best endeavors to convey" property to the complainant is not an agreement to convey. But here it is alleged that due diligence was used to obtain title.

For the above reasons the judgment denying specific performance must be affirmed. But there is a further ground upon which we would feel constrained also to affirm the judgment, and that is the laches of the plaintiffs in asserting their alleged right, in view of the changed conditions affect-

ing the value of the land and the rights and interest of the parties.

A decree for the specific performance of a contract for the sale of real estate does not go as a matter of course, but is granted or withheld according as equity and justice seem to demand in view of all the circumstances of the case. (McCabe v. Matthews, 155 U. S. 550, 15 Sup. Ct. 190, 39 L. Ed. 253.) And courts of equity will not decree specific performance when to do so would be plainly inequitable and unjust. (Pomeroy v. Fullerton, 131 Mo. 581, 33 S. W. 173.) In Holgate v. Eaton, 116 U. S. 33, at page 40, 6 Sup. Ct. 224, 29 L. Ed. 538, it is said by Mr. Justice Miller that the following language of Mr. Justice Story in Taylor v. Longworth, 14 Pet. 172, 174, 10 L. Ed. 405, has become a legal maxim in this class of cases, viz: "In the first place, there is no doubt that time may be of the essence of a contract for the sale of property. It may be made so by the express stipulation of the parties, or it may arise by implication from the very nature of the property, or the avowed objects of the seller or purchaser. And even when time is not, thus, either expressly or impliedly, of the essence of the contract, if the party seeking a specific performance has been guilty of gross laches, or has been inexcusably negligent in performing the contract on his part; or if there has, in the intermediate period been a material change of circumstances, affecting the rights, interests or obligation of the parties; in all such cases courts of equity will refuse to decree specific performance, upon the plain ground that it would be inequitable and unjust."

In Pickering v. Pickering, 38 N. H. 400, the court said, stating a well-settled principle: "Relief by specific performance is matter not of absolute right in the party, but of sound, reasonable discretion in the court, and the granting of such relief must always be entirely equitable. The court will never compel specific performance, where, looking at all the circumstances on both sides, it is apparent that injustice would or might probably be done thereby."

In such cases a court of equity will not allow of a delay which would enable a party to take advantage of the turn of the market, and have the contract performed, only in case it suits his interest. And in Drees v. Waldron, 212 Fed. 93, 128 C. C. A. 609, it is said: "The existence of laches is primarily determined not by lapse of time but by considerations of justice." In Patterson v. Hewitt, 195, U. S. 309, 25 Sup. Ct. 35, 49 L. Ed. 264, the court by Mr. Justice Brown, speaking for the court, states the rule applicable under circumstances such as are found in this case as follows:

"The defence of laches which prompted the dismissal of the bill in this case, has so often been made the subject of discussion in this court that a citation of cases is quite unnecessary. Some degree of diligence in bringing suit is required under all systems of jurisprudence. In actions at law, the question of diligence is determined by the words of the statute. If an action be brought before the statutory time expires, it will be sustained; if a day after, it will be defeated. In suits in equity the question is determined by the circumstances of each particular case. The statute of limitations consorts with the rigid principles of the common law, but is ill adapted to the flexible remedies of a court of equity. The statute frequently works great practical injustice—the doctrine of laches, never. True, lapse of time is one of the chief ingredients, but there are others of almost equal importance. Change in the value of the property between the time the cause of action arose and the time when the bill was filed; complainant's knowledge or ignorance of the facts constituting the cause of action, as well as his diligence in availing himself of the means of knowledge within his control, are all material to be considered upon the question whether the suit was brought without unreasonable delay."

In an opinion by the same learned justice, in a case involving mining property, where there had been a great increase in value, it is said: "Under such circumstances, where property has been developed by the energy and at

the expense of the defendants, courts will look with dis-
favor upon the claims of those who have lain idle while
awaiting the results of this development, and will require
not only clear proof of fraud, but prompt assertion of plain-
tiff's rights." (Johnston v. Standard Min. Co., 148 U. S.
360, 13 Sup. Ct. 585, 37 L. Ed. 480.) And we quote the
following from the case of Twin Lick Oil Co. v. Marbury,
91 U. S. 587, 23 L. Ed. 328, referring to the fluctuating
value of oil wells: "Property worth thousands today is
worth nothing tomorrow; and that which today would
sell for a thousand dollars at its fair value, may by the
natural changes of a week, or the energy and courage
of desperate enterprise, in the same time be made to yield
that much every day. The injustice, therefore, is obvious
of permitting one holding the right to assert an ownership
in such property to voluntarily await the event, and then
decide, when the danger which is over has been at the risk
of another, to come in and share the profit." (And see
Anderson v. Luther Min. Co., 70 Minn. 23, 72 N. W. 820.)

In Patterson v. Hewitt, supra, it was further said: "in-
deed, in some cases the diligence required is measured by
months rather than by years." So in the case of In re. Casey,
195 Fed. 322, the court said: "Laches is measured some-
times by years and sometimes by days, depending on the
nature of the case and the circumstances."

In this case the land involved was of comparatively small
value when the contract was made, but at or about the time
of the expiration of the two-year period a possible or pros-
pective increase in value became apparent through the dis-
covery of oil upon other lands, and it appears that the
plaintiffs were approached by representatives of the Ohio
Oil Co., who proposed a lease to them for drilling upon the
land, but the plaintiffs declined to lease it on the ground that
they did not have title to it, showing this contract disclosing
the extent of their interest. They learned of the issuance
of the patent sometime thereafter, but just when does not
appear, though, as we have stated above, probably between
the early part of June and sometime in August, 1914, and

then, through Mr. Enterline, made some demand upon the defendants,—probably for a conveyance, since the answer alleges that no demand for a conveyance was made until August 28, 1914.

. After such demand it appears that the plaintiffs entered into some arrangement with another party to whom they assumed to give possession of the land, presumably for the purpose of exploring for oil, for it is shown that some oil well casing was placed on the land. On September 21, the Ohio Oil Company also placed some casing on the land; and the petition alleges, without stating the time, that said company, although warned not to enter into possession of the ground, did actually by force enter thereon and exclude the plaintiffs therefrom, and commenced drilling thereon. They succeeded in drilling a producing oil well in October of the same year. This suit was brought by the filing of the original petition on February 13, 1915, praying, in addition to specific performance as against the principal defendants a showing and accounting by the Ohio Oil Company of the oil and other substances taken from the land, a judgment against said company therefor, and the appointment of a receiver, if found necessary, pending the litigation.

Thus, with knowledge of the facts, the plaintiffs waited before asserting their right here claimed until the value of the land for oil purposes had been demonstrated by the defendant Phelps through his lease to said operating company, allowing their decision to insist upon what they now claim as their right to depend upon the success or failure of the drilling operations carried on at the expense of others. We think that a very prompt assertion of their alleged right was necessary to justify the exercise of equity jurisdiction for the enforcement thereof. With respect to the time intervening before suit was brought, as affecting the question of laches, it is apparent that the situation would not be materially different if there had been a much longer delay. The changed conditions causing the increase in value had already occurred, and while the plaintiffs remained inactive so far as this record discloses.

The defendants strongly insist upon another ground as a complete defense to the action, in addition to the matters above considered, viz: The failure of the plaintiffs to execute the bond provided for in the contract. And the point is discussed at some length in the briefs, especially with reference to whether the defendants waived the bond by tendering title to and conveying other parcels of land, or are estopped from claiming any right under the provision for the bond and a non-compliance therewith. While we are not convinced that there was a waiver of the bond as to the parcel of land in controversy here, or that the doctrine of estoppel applies, we think it unnecessary to decide those questions or any other question relating to the effect of the provision for the bond or the failure of the plaintiffs to comply with it.     *The judgment is affirmed.*

BEARD, C. J., and BLYDENBURGH, J., concur.