Daniel E. MARKEN, Plaintiff,

v.

C. M. GOODALL, a widow, et al.,
Defendants.

No. 5615 Civil.

United States District Court,
D. Wyoming.

Oct. 13, 1972.

Carl L. Lathrop, of Lathrop, Lathrop
& Uchner, Cheyenne, Wyo., for plaintiff.

H. B. Harden, Jr., of Harden & Harden, Casper, Wyo., for C. M. Goodall and Goodall Oil Co.

Donald C. McKinlay of Holme, Roberts & Owen, Denver, Colo., Ted Simola, Cheyenne, Wyo., and Hunter Johnson, Regional Atty. Legal Division, Denver, Colo., for Atlantic Richfield Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KERR, District Judge.

### FINDINGS OF FACT

1. That this is a diversity action brought by plaintiff seeking title to an oil lease sold by defendant Goodall Oil Company, hereinafter referred to as "Goodall", to defendant Atlantic Richfield Oil Company, hereinafter referred to as "Atlantic".

2. That plaintiff is a citizen of the State of Wyoming.

3. That defendant C. M. Goodall, a widow, is a citizen of the State of Nebraska, and Goodall Oil Company is a sole proprietorship and trade name used by defendant C. M. Goodall. Atlantic is a corporation organized under the laws of the State of Pennsylvania, having its principal place of business in the State of Utah and authorized by the Secretary of State of Wyoming to do business in the State of Wyoming. The amount in controversy exceeds the sum of Ten Thousand Dollars ($10,000.00), exclusive of interest and costs.

4. That during and prior to the year 1952, plaintiff was engaged as an oil well drilling contractor and was generally in the oil business.

5. That the State of Wyoming executed its oil and gas lease No. 0–9299 to Otto R. Bollin, dated November 2, 1949, and Otto R. Bollin executed an assignment of said lease to Superior Oil Company, dated December 16, 1949. Superior Oil Company then executed diverse assignments and corrective assignments of said oil and gas lease to plaintiff, the first being dated in October of 1952 and the last dated February 2, 1954.

6. That on August 8, 1952, plaintiff agreed by contract to sell R. A. Goodall, deceased husband of C. M. Goodall, an undivided working interest in Wyoming Oil and Gas Lease No. 0–9299 and subsequently executed an assignment to R. A. Goodall.

7. That subsequent to August 8, 1952, and prior to December 13, 1952, plaintiff executed an undated Joint Operating Agreement and submitted it to R. A. Goodall for execution. R. A. Goodall made numerous corrections and additions to said operating agreement and resubmitted the agreement to plaintiff for his approval. Plaintiff never returned the altered agreement to R. A. Goodall and the only operating agreement held by the Goodalls from 1952 to the present litigation was a copy of the Joint Operating Agreement executed by plaintiff with changes made and initialed by George W. Osbeck on behalf of R. A. Goodall. This agreement was never executed by R. A. Goodall or by anyone on his behalf.

8. That R. A. Goodall died in September 1953, and his interest in oil and gas lease No. 0–9299 passed to his widow, the defendant C. M. Goodall.

9. That this controversy arises out of paragraph 11 of the alleged Joint Operating Agreement which reads in part as follows:

"Before the sale by any party hereto of its interest in the Joint Leases, or any of them, the other parties hereto shall be given the refusal thereof at the price offered in good faith by a third party, and shall have the preferred right to purchase at the price stated, which right shall be exercised within five (5) days after receipt (sic) of written notice of the offer made by a third party".

10. That on or about the time the alleged Joint Operating Agreement was executed by plaintiff, he obtained the signatures of the other working interest holders in the lease being approximately nine in number on similar, but separate, operating agreements.

11. That in the course of dealings between plaintiff and various other working interest holders in the subject lease and operating agreements no formal notices were ever given or required for the sale of any interest to third parties nor did plaintiff ever give Goodall notice of the sale or mortgage of any interest by him to third parties.

12. That on January 16, 1967, plaintiff indicated in a letter to Sinclair Oil and Gas Company, Atlantic's predecessor, that "We are not interested in other interest [sic] in the lease as they change from time to time * * * ".

13. That pursuant to invitation to bid submitted by Goodall on August 14, 1968, defendant Atlantic (at that time Sinclair Oil Co.) offered to purchase on September 18, 1968, Goodall's interest in the subject lease for Twenty Thousand Dollars ($20,000.00) subject to certain title corrective work. The offer was accepted and the transaction consummated by an assignment effective November 1, 1968, and by payment of Twenty Thousand Dollars ($20,000.00) on May 3, 1970.

14. That on June 21, 1967, Atlantic commenced a water flood recovery program on subject and adjacent leases which did not live up to expectation until April or May of 1970. A marked increase in production was obtained commencing in August of 1970.

15. That pursuant to a conversation held at the Sinclair production office in Casper on October 24 or 25, 1968, Clarence Peterson, Atlantic's attorney, first advised plaintiff of the proposed sale and at the same time requested plaintiff to produce title documents to the lease. Some days later Peterson telephoned plaintiff and his wife and requested they furnish him with two assignments from plaintiff to Goodall and an executed copy of the Joint Operating Agreement.

16. That Charles A. Redpath, Atlantic's new attorney, telephoned plaintiff's wife some time in November of 1968 and again requested the documents referred to above.

17. That George W. Osbeck, employee of Goodall, wrote plaintiff on January 10, 1969, requesting him to sign a "REPLACEMENT ASSIGNMENT", stating it was impossible to furnish Sinclair (Atlantic) with the original lease from plaintiff to Goodall.

18. That on January 27, 1969, Osbeck telephoned plaintiff and advised him of the sale of the Goodall interest to Atlantic for the sum of Twenty Thousand Dollars ($20,000.00).

19. That on May 14, 1969, Osbeck telephoned plaintiff in order to get the replacement assignment signed but talked with plaintiff's wife, who stated she would attempt to get plaintiff to sign the document.

20. That on December 3, 1969, plaintiff telephone Osbeck regarding the sale of the lease in question to Atlantic. Osbeck informed plaintiff the lease had been sold for Twenty Thousand Dollars ($20,000.00), to which plaintiff replied "Well, if they don't pay you, perhaps I can buy it".

21. That on January 26, 1970, James Patrick Miller, Attorney for Atlantic, wrote plaintiff requesting him to sign the Replacement Assignment.

22. That by certified mail postmarked April 3, 1970, Miller again wrote plaintiff stating Atlantic could not conclude the purchase without the return of the Replacement Assignment and again asked that he sign the document.

23. That at no time during any of the aforementioned conversations or in response to any written or oral request, did Marken produce the requested assignments or operating agreement nor did he ever mention or assert any preferential right to purchase the Goodall interest. Plaintiff delayed in asserting his rights until September 21, 1970, which was after the Goodall interest had been sold to Atlantic. By this time the interest had, by virtue of the water flood, markedly increased in value

through the expenditure of considerable funds and risks taken by Atlantic.

24. That defendants Goodall and Atlantic relied on the plaintiff's silence and apparent acquisition to the purported sale and consummated the sale of the lease interest. Atlantic in further reliance on plaintiff's silence incurred the risks and costs of the water flood recovery program.

25. That defendants Goodall and Atlantic at all times in their dealings with the plaintiff were unaware of any executed copy of the alleged Joint Operating Agreement, in that plaintiff neither responded to nor executed the Joint Operating Agreement he received containing the changes entered by Osbeck on behalf of R. A. Goodall.

26. That the value of the Goodall interest prior to November 1, 1968, was Twenty Thousand Dollars ($20,000.00) and immediately after November 1, 1968, the value of said interest was Twenty Thousand Dollars ($20,000.00) and plaintiff has suffered no damages by virtue of the sale of the Goodall interest to Atlantic.

## CONCLUSIONS OF LAW

1. The Court has jurisdiction over the parties and the subject matter of this action.

2. The Joint Operating Agreement which is the subject matter of this action was submitted by plaintiff to R. A. Goodall and resubmitted to plaintiff with numerous changes. Plaintiff never advised Goodall whether he accepted or rejected the proposed changes.

3. Plaintiff had actual knowledge of the proposed sale by Goodall to Atlantic and therefore it was not necessary that Goodall give plaintiff written notice.

■ 4. Plaintiff waived any right which he had to acquire the interest sold by Goodall to Atlantic by remaining silent and acquiescing in the sale for a period of almost two years after acquiring actual knowledge of the proposed sale. "[W]here a plaintiff, with knowledge of the relevant facts, acquiesces for an unreasonable length of time in the asser-

tion of a right adverse to his own, the court may presume assent to the adverse right, and the consequent waiver of the right sought to be enforced". Pfister v. Cow Gulch Oil Co., 189 F.2d 311 (10th Cir. 1951).

■ 5. Plaintiff, after having received actual knowledge of the proposed sale, remained silent with regard to his right of refusal while defendants entered upon the costly and risky water flood recovery program which ultimately resulted in greatly enhancing the value of the lease. It was only after the water flooding proved successful that plaintiff broke his long silence and demanded he be permitted to exercise his right of refusal. It was eloquently stated by Justice Potter in the case of Merrill v. Cattle Co., 26 Wyo. 219, 181 P. 964 (1918), that "[P]roperty worth thousands to-day is worth nothing to-morrow; and that which to-day would sell for a thousand dollars at its fair value may, by the natural changes of a week, or the *energy and courage of desperate enterprise*, in the same time be made to yield that much every day. The injustice, therefore, is obvious, of permitting one holding the right to assert an ownership in such property to voluntarily await the event, and then decide, when the danger which is over has been at the risk of another, to come in and share the profit". (Emphasis supplied).

■ 6. The law explicitly states that when parties are engaged in business enterprises, such as oil and gas leases, which by their very nature fluctuate substantially in value, such parties cannot demand specific performance of contracts unless they assert their rights diligently and without unreasonable delay. Socony Mobil Oil Company v. Continental Oil Company, 335 F.2d 438 (10th Cir. 1964). This axiom of law clearly applies to the circumstances leading to plaintiff's claim for specific performance of his right of refusal as provided for in the Joint Operating Agreement.

7. The plaintiff's conduct in failing to assert an adverse claim to Goodall's proposed sale of the lease until Atlantic

successfully completed a risky business venture which increased the value of the lease, brings into effect the doctrine of laches. This Court has previously stated "[T]he rule of laches must foreclose tardy claimants from asserting any rights in property when they sit quietly by and permit some one else 'to bring into form and being a latent property right' which only in recent years appeared to have considerable or potential value". Amerada Petroleum Corporation v. Rio Oil Co., 225 F.Supp. 907 (D.C.Wyo.1964).

8. The Tenth Circuit has stated with regard to laches that "[A] person may not withhold his claim awaiting the outcome of a doubtful enterprise and, after the enterprise has resulted in financial success favorable to the claimant, assert his interest, especially where he has thus avoided the risks of the enterprise". Pfister v. Cow Gulch Oil Co., supra. Since plaintiff failed to exercise his preferential right of refusal when he first received actual knowledge of the sale of the lease, and chose instead to sit back and allow Atlantic to undertake the doubtful water flood program the doctrine of laches prevents him from asserting his right now that the property, in which he risked nothing, proved to be successful.

9. Plaintiff is not the owner of or in possession of the interest assigned in subject lease by Goodall to Atlantic.

10. Considering the evidence as a whole, it fails to establish a breach of agreement by Goodall to assign the interest in the subject lease to plaintiff.

11. Plaintiff has failed to establish by a preponderance of the evidence that plaintiff has suffered any damages by virtue of the sale of the interest in the subject lease by Goodall to Atlantic.

12. In view of the foregoing Findings of Fact and Conclusions of Law, the Court deems it unnecessary to rule on the defense based on the Rule Against Perpetuities.

13. Judgment will be entered dismissing the complaint, together with the cause, the parties to pay their own costs.